**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

MEGAN TAYLOR and SPENCER HEINTZ,
individuals, on behalf of themselves, the
general public, and those similarly situated,

                            Plaintiffs,

      v.

UPSLOPE, LLC,

                            Defendant.

---

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

**<u>INTRODUCTION</u>**

1.     Plaintiffs Megan Taylor and Spencer Heintz, by and through their counsel, bring this class action against Upslope, LLC ("Defendant") to seek redress for Defendant's deceptive and unlawful practices in labeling and marketing its Spiked Snowmelt Craft Hard Seltzers Electrolytes Series +.

2.     Consumers are increasingly interested in getting health benefits from their food and drink. Consumers are attracted to "better for you" products that are healthier than other alternatives in food and beverage categories that are not typically healthy (or even unhealthy). To make healthy choices, consumers rely on food and drink product labels.

3.     Intending to profit from consumers' increasing desire to consume healthy food and drink, Defendant fortified its alcoholic beverage with electrolytes, including nutrients

calcium, magnesium, and potassium. Of course, adding an insignificant amount of nutrients to an alcoholic beverage will do little to overcome the harmful effects of alcohol.

4.      But Defendant did just this. Defendant fortified its Spiked Snowmelt Craft Hard Seltzer Electrolytes Series + with an insignificant amount of electrolytes, including nutrients such as calcium, magnesium, and potassium, and then promoted on its labels and advertising that the beverage is "ELECTROLYTES SERIES +," and "ELECTROLYTE INFUSED." Defendant's campaign is both misleading and dangerous to consumers. It is also unlawful, as Defendant's labels and products violate FDA regulations and policies acknowledging such danger.

5.      Accordingly, Defendant's manufacturing, labeling, and advertising of the Spiked Snowmelt Craft Hard Seltzer Electrolytes Series + as containing electrolytes and the other representations detailed herein are unlawful, misleading, and designed to deceive consumers into purchasing the Spiked Snowmelt Craft Hard Seltzer Electrolytes Series + beverages. Plaintiffs bring this action to stop Defendant's misleading practices.

## PARTIES

6.      Megan Taylor ("Plaintiff") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Grayslake, Illinois.

7.      Spencer Heintz ("Plaintiff") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Denver, Colorado.

8.      Upslope, LLC (d/b/a Snowmelt) ("Defendant") is a limited liability company existing under the laws of the State of Colorado, having its principal place of business in Boulder, Colorado.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2)(a). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one Plaintiff (and other members of the Class) and Defendant are citizens of different states.

10.     This Court has general personal jurisdiction over Defendant because it conducts substantial business in this District and has sufficient minimum contacts with the State of Colorado. Specifically, Defendant maintains its corporate headquarters in Boulder, Colorado.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of Colorado, including within this District.

12.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

**Defendant's Products**

13.     Defendant manufactures, distributes, markets, advertises, and sells a variety of hard seltzers under the brand name "Spiked Snowmelt."

14.     Hard seltzers are carbonated, alcoholic beverages, mainly derived from either a brewed sugar base or brewed malt base. They are often purchased and consumed because they are a low calorie, low sugar, inexpensive alcoholic drink. They are marketed to health-conscious consumers.

15.     The Spiked Snowmelt Craft Hard Seltzer Electrolytes Series + beverages predominately, uniformly, and consistently state on the principal panel of the product labels that

they contain electrolytes by claiming "ELECTROLYTES SERIES +" and "ELECTROLYTE INFUSED." Spiked Snowmelt Craft Hard Seltzer Electrolytes Series + comes in a variety of flavors, including Juniper & Lime, Tangerine & Hops, Pomegranate & Acai, Passionfruit & Mango, Grapefruit & Hops, and Peach Lemonade. These flavors, and any other flavors or Snowmelt Hard Seltzers that make a claim regarding electrolytes, will hereinafter be referred to as the "Product(s)."

16.     The representation that the Products contain electrolytes and provide hydration was uniformly communicated to Plaintiffs and every other person who purchased any of the Products in the United States. The same or substantially similar product label has appeared on each respective product during the entirety of the Class Period in the general form of the following examples:





17.     The Products' front label emphasized "ELECTROLYTE SERIES +" and "ELECTROLYTE INFUSED."

18.     An example of the ingredients in the Products is shown below:



19.     Defendant's advertising boasts the addition of electrolytes and encourages the consumption of Products for hydration benefits. For example, on its website, Defendant describes the Products as "thirst-crushing flavors artfully infused with Skratch Labs' Sport Hydration Drink Mix."[1] Alongside the Products on the website, Defendant suggests the Products pair well with a variety of activities, including: hot yoga, running clubs, pickleball, and post spin-class.[2]

20.     In recent years, consumers' demand for hard seltzers has exploded. In 2018, hard seltzer sales were a mere $210 million and in 2019, sales sky-rocketed to $1.2 billion with no signs of slowing.[3]

21.     In order to distinguish the Product in the bullish market of hard seltzers, Defendant has infused the Products with electrolytes to distract from the harm that may occur from alcoholic consumption. Seeking to cash in on the hard seltzer craze, Defendant has violated FDA policies and regulations and for the reasons described herein, its labels are misleading and deceptive.

**The Products Are Harmful**

22.     Federal regulations require that the Products bear the following warning: "GOVERNMENT WARNING: (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) Consumption of

---

[1] https://snowmelt.com/electrolyte/ (last accessed June 23, 2022).
[2] *Id.*
[3] https://www.brewerycompliance.com/hard-seltzer

alcoholic beverages impairs your ability to drive a car or operate machinery, and **may cause health problems**." 27 U.S.C. § 215 (emphasis added).

23.     In enacting this requirement, Congress found that "the American public should be informed about the health hazards that may result from the consumption or abuse of alcoholic beverages."[4]

24.     The nutrient content of alcoholic beverages is usually negligible. Because they provide almost no nutrients, alcoholic beverages are considered "empty calories."[5]

25.     Over the long-term, consuming excess alcohol can also impair the body's ability to digest and utilize nutrients.[6]

26.     Alcohol is a diuretic, causing the kidneys to remove fluid from the body more quickly than normal. This process of elimination takes precedence over all other metabolic processes, including the absorption of nutrients and minerals. Thus, the Products will do little to contribute to the electrolyte needs of an adult.

27.     The United States Department of Agriculture's 2020-2025 Dietary Guidelines for Americans (DGA) encourage "[a]dults who choose to drink . . . to limit daily intakes . . . so as

---

[4] ANTI-DRUG ABUSE ACT OF 1988, 1988 Enacted H.R. 5210, 100 Enacted H.R. 5210, 102 Stat. 4181, 4518, 100 P.L. 690, 1988 Enacted H.R. 5210, 100 Enacted H.R. 5210
[5] Lieber CS. Relationships Between Nutrition, Alcohol Use, and Liver Disease, Relationships Between Nutrition, Alcohol Use, and Liver Disease. National Institutes of Health. 2004. https://pubs.niaaa.nih.gov/publications/arh27-3/220-231.htm
[6] Lieber CS. Alcohol: its metabolism and interaction with nutrients. *Annu Rev Nutr.* 2000; 20:395-430.

not to exceed daily calorie limits," and cautions that, in general, "drinking less is better for health than drinking more."[7]

28.    Evidence indicates that, among those who drink, higher average alcohol consumption is associated with an increased risk of death from all causes compared with lower average alcohol consumption. Emerging evidence suggests that even drinking within the recommended limits may increase the overall risk of death from various causes, such as from several types of cancer and some forms of cardiovascular disease.[8]

29.    According to the CDC, "Excessive alcohol use is responsible for more than 95,000 deaths in the United States each year, or 261 deaths per day. These deaths shorten the lives of those who die by an average of almost 29 years, for a total of 2.8 million years of potential life lost. It is a leading cause of preventable death in the United States, and cost the nation $249 billion in 2010."[9]

30.    Worse, "[m]ore than half of alcohol-attributable deaths are due to health effects from drinking too much over time, such as various types of cancer, liver disease, and heart disease."[10]

_____

[7] U.S. Department of Agriculture and U.S. Department of Health and Human Services. Dietary Guidelines for Americans 2020-2025. 2020. p49.
https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf
[8] *Id.*
[9] Centers for Disease Control and Prevention, Alcohol and Public Health,
https://www.cdc.gov/alcohol/features/excessive-alcohol-deaths.html (last accessed June 15, 2021).
[10] *Id.*

**The Products Do Not Provide Health Benefits**

31.     Attempting to overcome the deleterious health impact of the Products, Defendant added electrolytes to the Products and includes "ELECTROLYTES +" and "ELECTROLYTE INFUSED" on the label.

32.     There is an exceedingly small amount of electrolytes in the Products that will be absorbed by the body. On any product label, the ingredients are listed in order of predominance, with the ingredients used in the greatest amount first, followed in descending order by those in smaller amounts.[11] On the Products' ingredient list, the nutrients appear as the seventh, eighth, and ninth ingredients listed, demonstrating there is very little of the nutrients in the Products.

33.     The Products' Nutrition Facts Panel confirms the infinitesimal amount of nutrients by way of the percent daily value (%DV) listed for potassium and calcium. The daily value for potassium and calcium is calculated based on the recommended daily intake as determined by the FDA. The amount of calcium in the Products is 3% of the daily value. The amount of potassium in the Products is 0%.[12]

34.     As described above, alcohol is a toxin and when consumed, the body prioritizes removal of the toxin over all other processes, including metabolizing nutrients. Thus, alcohol consumption interferes with nutrient absorption, and even where a body absorbs nutrients,

_____

[11] https://www.fda.gov/food/food-ingredients-packaging/overview-food-ingredients-additives-colors#:~:text=How%20are%20ingredients%20listed%20on,by%20those%20in%20smaller%20amounts.
[12] The Products do not list the %DV for magnesium.

alcohol prevents the body from using nutrients by altering the transport, metabolism, and storage of nutrients.[13]

35.     Electrolytes are commonly understood to provide hydration benefits.

36.     Defendant's use of the term "ELECTROLYTE SERIES +" and "ELECTROLYTE INFUSED" on the Product labels further implies that the Products are hydrating or providing some level of nutrition. But because alcohol is a diuretic, it will not provide any hydration benefits. Instead, it dehydrates the body.

37.     Combined with the fact that alcohol inhibits metabolism and absorption, consumers do not receive the benefit of electrolytes when consuming the Products.

38.     In summary, Defendant's representations "ELECTROLYTE SERIES +" and "ELECTROLYTE INFUSED" on the Products misleads reasonable consumers into believing that the electrolyte content of the Products provides hydration or other health benefits. The insignificant amount of electrolytes, including nutrients calcium, magnesium, and potassium, in the Products will not provide consumers with the health benefits that Defendant's representations lead them to expect, and even worse, the Product is actually dangerous to consumers' health.

39.     Defendant's use of the representations "ELECTROLYTE SERIES +" and "ELECTROLYTE INFUSED" and the other representations and images detailed herein in the marketing, labeling, and advertising of the Products is thus nothing more than a marketing gimmick intended to deceive consumers into purchasing the Products over other competing

---

[13] Lieber, Charles S. "Alcohol and nutrition; an overview." Alcohol Health & Research World, vol. 13, no. 3, 1989, p. 197+. *Gale Academic OneFile*, link.gale.com/apps/doc/A8191860/AONE?u=anon~4ce0ada0&sid=googleScholar&xid=296d49 91. Accessed 14 July 2021.

products. Accordingly, Defendant's representations concerning the nutritional qualities, health qualities, and ingredients of the Products are false, misleading, deceptive, and unlawful.

**Federal and State Regulations**

40.      The Federal Food, Drug, and Cosmetics Act (the "FDCA"), 21 U.S.C. § 343(a), provides that a food is misbranded if "its labeling is false or misleading in any particular."

41.      The FDA has provided guidance that fortification of certain products, including carbonated beverages, is not appropriate. 21 C.F.R. § 104.20 (the "Fortification Policy").[14] The Fortification Policy states that "The random fortification of foods . . . could result in deceptive and misleading claims."

42.      Specifically, under the Fortification Policy, the FDA "does not encourage indiscriminate addition of nutrients to foods, nor does it consider it appropriate to fortify … snack foods such as … carbonated beverages." *See* 21 C.F.R. § 104.20(a).

43.      In a 2015 Q&A Guidance Document relating to the Fortification Policy, the FDA was unequivocal:

> **B4. Is it appropriate to add vitamins and minerals to alcoholic beverages?**
>
> No. Under our fortification policy, we do not consider it appropriate to add vitamins and minerals to alcoholic beverages.

---

[14] Under the U.S. Internal Revenue Code "IRC" 27 CFR Part 7, a malt-based hard seltzer is considered a malt beverage which is subject to Alcohol and Tobacco Tax and Trade Bureau ("TTB") labeling and advertising regulations, while a sugar-based hard seltzer is considered "beer" and is subject to FDA regulation. The Products are derived from sugar, and therefore, are subject to FDA regulations.

44.     The Fortification Policy defines "fortification" as "the addition of a vitamin, mineral, or protein to a food." The addition of magnesium lactate, calcium citrate, and potassium citrate in the Products is fortification because these ingredients are used to add nutrients.

45.     The Fortification Policy is a guidance that is binding in certain circumstances. For example, where a food advertises the fortification using words like "added," "plus," or other synonyms, the Policy is binding. See 21 C.F.R. 101.54(e).

46.     Identical federal and state laws, including Colorado and Minnesota laws, regulate the content of labels on packaged food and drink. The requirements of the FDCA, and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the Minnesota legislature in the Minnesota Food Law. Minn. Stat. § 31.101, subd. 8 ("Applicable federal regulations including recodification contained in Code of Federal Regulations, title 21, parts 0-1299, Food and Drugs, not otherwise adopted herein, also are adopted as food rules of this state.") Colorado similarly has identical requirements to the FDCA, including a prohibition on labeling that is "false or misleading in any particular." Colo. Rev. Stat. § 25-5-411. The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

47.     Under the FDCA, the term misleading is a term of art that covers labels that are technically true, but are likely to deceive consumers. Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

48.     Further, in addition to its blanket adoption of federal labeling requirements, Minnesota has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations. *See* Minn. Stat. § 31.124 (food misbranded if label is false and misleading).

49.     Under Colorado and Minnesota law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded products have no economic value and are legally worthless.

**Defendant's Marketing and Labeling of its Products Violates State and Federal Food Labeling Laws**

50.     As the FDA recognizes in its Fortification Policy, the fortification of unhealthy foods, such as alcoholic and carbonated beverages, is misleading and deceptive to consumers. The Products deceive consumers by implying health and hydration benefits, despite the fact that the alcohol in the product prohibits and counteracts any benefits from the scant amount of nutrients in the Products. Moreover, on information and belief, the claim of electrolytes is false and misleading given the presence of alcohol in the Products which diminishes any hydrating benefit from the electrolytes. Thus, the Products are misleading and therefore misbranded.

51.     Further, the Products are required to comply with the Fortification Policy because the Products make "more" claims regulated by 21 C.F.R. § 101.54(e).

52.     The term "+" in the context of the statement "ELECTROLYTE SERIES +" is a synonym for "plus" because it signifies the addition of the nutrient. Where a product makes a "plus" claim, the product must comply with the Fortification Policy. 21 C.F.R. § 101.54(e)(ii). Therefore, the Fortification Policy is binding on the Products. 21 C.F.R. § 101.54(e).

53.     The Products violate the Fortification Policy because they are carbonated, alcoholic beverages that are fortified with electrolyte nutrients, including calcium, magnesium, and potassium. Moreover, the Products do not meet any of the other conditions for fortification as provided in the Fortification Policy. See 21 C.F.R. § 104.20(b)-(e). The Products are therefore unlawfully fortified, and the Product labels contain prohibited nutritional claims. Thus, the Products are misbranded.

54.     The Products are unlawful, misbranded, and violate Minnesota and Colorado law because the Products' labels state "ELECTROLYTE SERIES +" and "ELECTROLYTE INFUSED," implying the Products are a healthful source of nutrients and hydration benefits, even though FDA guidance states that fortification of alcoholic, carbonated beverages is not appropriate and would result in misleading consumers.

55.     Defendant's marketing, advertising, and sale of the Products violates the false advertising provisions of the Minnesota Food Law, including but not limited to section 31.02, which prohibits the manufacture, sale, distribution in commerce of misbranded food, and prohibits the dissemination of any false advertising. Similarly, the Products violate Colorado's prohibition on false and misleading labeling. Colo. Rev. Stat. § 25-5-411.

56.     Defendant has violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including, but not limited to, 21 C.F.R. § 101.65(d), which have been incorporated by reference into Minnesota and Colorado law, by fortifying the Products and misleading consumers with claims of healthfulness.

57.     A reasonable consumer would expect that the Products are a source of electrolytes and nutrients, that consumption of the Products benefits hydration and physical health and that

14

the labels would not be contrary to the policies or regulations of Minnesota and Colorado and/or the FDA.

58.    Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's labeling claims, especially at the point of sale. Consumers would not know that the Products are unlawfully fortified and unlawfully labeled, and that alcohol interferes with the metabolism of nutrients and will not provide hydration benefits. Its discovery requires investigation well beyond the grocery store aisle and knowledge of FDA regulations and food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that the deleterious effects of alcohol will not be overcome by the fortification of the Products with scant amounts of nutrients from electrolytes or that the alcohol in the beverages will interfere with the metabolism of the electrolyte nutrients. Nor does an average consumer have the specialized knowledge necessary to ascertain that alcohol nulls any hydration benefits, such that there are insignificant nutrients in the beverages. Therefore, consumers had no reason to investigate whether the Products actually are a healthful source of nutrients as the labels claim. Thus, reasonable consumers relied on Defendant's representations regarding the nature of the Products.

59.    Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Defendant intends consumers to understand the label claims to communicate health benefits. Indeed, Defendant's website markets the Products as follows: "the Electrolyte Series delivers the perfect après everything finish line celebration beverage." Further, Defendant states, "[t]he custom Sport Hydration Drink Mix blend delivers electrolytes (sodium citrate, magnesium lactate, calcium citrate, and potassium citrate) and

ascorbic acid without artificial sweeteners, isolates, colors, or preservatives."[15] Henry Wood, the Vice President of Sales and Marketing of Upslope has said "Collaborating with Skratch, we're confident that we've developed the quintessential post-adventure refreshment."[16] In the same article, the Vice President of Marketing for Skratch Labs states "it makes total sense to mix in some Skratch Labs Sport Hydration Mix with their delicious Spiked Snowmelt for a killer post-exercise drink full of electrolytes. It was a no brainer."

60.     Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done with the claim that the Products are a healthful source of electrolytes and nutrients.

**Defendant Intends to Continue to Market the Products as Containing Electrolytes**

61.     Because consumers pay a price premium for products that contain electrolytes, and because such products are perceived as providing health benefits, Defendant is able to both increase its sales and retain more profits by fortifying the Products and labeling them as containing electrolyte nutrients.

62.     Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors' products that are not unlawfully fortified and labeled, and/or (ii) commanding a higher price for the Products because consumers will pay more for them due to consumers' demand for healthful products.

---

[15] https://www.upslopebrewing.com/beer_category/spiked-snowmelt/ (last accessed June 16, 2022).
[16] https://www.brewbound.com/news/upslope-brewing-launches-electrolyte-series-spiked-snowmelt/ (last accessed June 16, 2022).

63.     The market for hard seltzer products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the electrolyte nutrients in the Products, Defendant has an incentive to continue to make such false and misleading representations. In addition, other trends suggest that Defendant has no incentive to change its labeling practices.

64.     For example, one market analysis revealed that the market for hard seltzers is expected to grow at a 16% compound annual growth rate through 2027.[17]

65.     Defendant continues to launch new flavors and lines to diversify its portfolio to maintain its competitive edge, making it likely that Defendant will continue to unlawfully fortify the Products and misleadingly advertise the Products to perpetuate the misrepresentations regarding the healthfulness of the Products.

## PLAINTIFFS' EXPERIENCES

**Megan Taylor**

66.     Plaintiff Megan Taylor purchased a Spiked Snowmelt Craft Hard Seltzer Electrolyte + Series Variety Pack from Total Wine in or around Burnsville, Minnesota in or around July 2021. Plaintiff Taylor relied on the nutrient content claim "ELECTROLYTE SERIES +" and "ELECTROLYTES INFUSED" when she purchased the Product, believing the Products would provide hydration and other benefits derived from electrolytes.

---

[17] https://www.toptal.com/finance/market-research-analysts/hard-seltzer-industry#:~:text=The%20global%20hard%20seltzer%20market,US%2C%20Canada%2C%20and%20Australia.

67.     At the time of her purchase of the Product, Plaintiff Taylor did not know that the Products were unlawfully fortified and mislabeled, and would not provide the claimed nutritional benefits. As a result of Defendant's misrepresentations and omissions, the Products have no, or at a minimum, a much lower value to Plaintiff Taylor.

68.     Plaintiff Taylor not only purchased the Products because of the unlawful and misleading labeling, but she also paid more for the Products than she would have paid for other or similar alcoholic beverage products that were not unlawfully fortified and labeled with misleading nutrient content claims.

69.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Taylor would not have purchased them, or at a very bare minimum, she would have paid less for the Products.

70.     Plaintiff Taylor continues to desire to purchase alcohol products, including those marketed and sold by Defendant. If the Products were reformulated to remove the nutrients, and labeled without the unlawful nutrient claims, Plaintiff Taylor would likely purchase the Products again in the future.

**Spencer Heintz**

71.     Plaintiff Spencer Heintz purchased a Spiked Snowmelt Craft Hard Seltzer Electrolyte + Series Variety Pack from City Market in Dillon, Colorado, in or around March 2022. Plaintiff Heintz relied on the nutrient content claim "ELECTROLYTE SERIES +" and "ELECTROLYTES INFUSED" when he purchased the Product, believing the Products would provide hydration and other benefits derived from electrolytes.

72.     At the time of his purchase of the Product, Plaintiff Heintz did not know that the Products were unlawfully fortified and mislabeled, and would not provide the claimed nutritional benefits. As a result of Defendant's misrepresentations and omissions, the Products have no, or at a minimum, a much lower value to Plaintiff Heintz.

73.     Plaintiff Heintz not only purchased the Products because of the unlawful and misleading labeling, but he also paid more for the Products than he would have paid for other or similar alcoholic beverage products that were not unlawfully fortified and labeled with misleading nutrient content claims.

74.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff Heintz would not have purchased them, or at a very bare minimum, he would have paid less for the Products.

75.     Plaintiff Heintz continues to desire to purchase alcohol products, including those marketed and sold by Defendant. If the Products were reformulated to remove the nutrients, and labeled without the unlawful nutrient claims, Plaintiff Heintz would likely purchase the Products again in the future.

## **CLASS ALLEGATIONS**

76.     Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> Nationwide Class: All persons in the United States who purchased the Products between July 1, 2018 and the present.

<u>Colorado Subclass</u>: All persons in the state of Colorado who purchased the Products between July 1, 2019 and the present.

<u>Minnesota Subclass</u>: All persons in the state of Minnesota who purchased the Products between July 1, 2018 and the present.

77.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

78.     Numerosity: Plaintiffs do not know the exact size the Classes, but they estimate that each is composed of more than 100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

79.     Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products provide health benefits as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. The questions of law and fact common to the Classes are:

a.     Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and/or unlawful;

b.     Whether Defendant's actions violate Federal, Minnesota, and Colorado laws invoked herein;

c.     Whether the fortification of the Products is unlawful;

d.      Whether labeling the Products with false and misleading claims causes them to command a price premium in the market as compared with similar products that do not make such misrepresentations;

e.      Whether Defendant's advertising and marketing regarding the Products sold to the class members was likely to deceive reasonable consumers;

f.      Whether representations regarding the electrolytes and nutrients in the Products are material to a reasonable consumer;

g.      Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

h.      The amount of profits and revenues earned by Defendant as a result of the conduct;

i.      Whether class and subclass members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j.      Whether class and subclass members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

80.     Typicality: Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Classes were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

81.     Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all class and subclass members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complains. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class and subclass members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the classes. By prevailing on her own claims, Plaintiffs will establish Defendant's liability to all class and subclass members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class and subclass members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class and subclass members.

82.     Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult

or impossible for individual members of the classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

83.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

### PLAINTIFFS' FIRST CAUSE OF ACTION
### Common Law Fraud, Deceit and/or Misrepresentation
### (Brought On behalf of the Nationwide Class and Subclasses)

84.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

85.    Defendant has fraudulently and deceptively informed Plaintiffs that the Products contain or provide electrolyte and hydration health benefits when it is unlawful for the Products to be fortified, and consumers will not actually receive such benefits from the Products for the reasons described herein.

86.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendant, and not reasonably known to Plaintiffs. Therefore, Defendant owed Plaintiffs and class members a duty to disclose accurate facts regarding the Products. The misrepresentations and omissions were material to Plaintiffs and class members and Defendant

intended Plaintiffs and consumers to rely on the misrepresentations and omissions.

87.     Defendant knew or should have known the composition of the Products, and knew or should have known that the Products were unlawfully fortified and would not provide the benefits represented on the label. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase Defendant's Products. Reasonable consumers would have been expected to rely on the misrepresentations and omissions, and Plaintiffs and Class members did in fact rely on the misrepresentations and omissions.

88.     Plaintiffs and those similarly situated relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

89.     In misleading Plaintiffs and not so informing Plaintiffs, Defendants breached their duty to them. Defendants gained financially from, and as a result of, their breach.

90.     By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, purchase the Products.

91.     Plaintiffs and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

92.     As a direct and proximate result of Defendants' misrepresentations and/or

omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

93.     Defendants' conduct as described herein was wilful and malicious and was designed to maximize Defendants' profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

**PLAINTIFFS' SECOND CAUSE OF ACTION**
**Unjust Enrichment**
**(Brought On Behalf of Plaintiffs and the Nationwide Class and Subclasses)**

94.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein

95.     Plaintiffs and Class members conferred a benefit on the Defendant by purchasing the Products.

96.     Defendant has been unjustly enriched in retaining the revenues from Plaintiffs' and Class Members' purchases of the Products, which retention is unjust and inequitable, because Defendant falsely represented that the Products contained and provided specific electrolyte and hydration health benefits despite it being unlawful to fortify the Products and that consumers will not receive such benefits from the Products for the reasons described herein. This harmed Plaintiffs and members of the class because they paid a price premium as a result.

97.     Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court. Defendant must also pay nonrestitutionary disgorgement of profits. Plaintiffs and those similarly situated have no adequate remedy at law to obtain this restitution.

98.      Plaintiffs, therefore, seeks an order requiring Defendant to make restitution to and pay nonrestitutionary disgorgement of profits to them and other members of the Class.

## PLAINTIFFS' THIRD CAUSE OF ACTION
**Violation of Colorado Consumer Protection Act**

**Brought on behalf of Plaintiff Heintz and the Colorado Subclass**

99.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

100.     Plaintiff Heintz brings this cause of action on behalf of himself and the members of the Colorado Subclass.

101.     Defendant is a "person" as defined by Colo. Rev. Stat. § 6-1-102(6).

102.     Defendant engaged in "sales" as defined by Colo. Rev. Stat. § 6-1-102(10).

103.     Plaintiff Heintz and the Colorado Class, as well as members of the general public, are actual or potential consumers of the Products sold by Defendant to actual consumers.

104.     As alleged herein, Defendant made false and misleading statements in connection with the advertising and sale of the Products, including by misrepresenting characteristics and qualities of the Products as alleged herein, such as representing that the Products contained and provided electrolyte and hydration benefits that the Products do not contain or provide. Further, the inclusion and advertising of electrolytes is a violation of the Fortification Policy, rendering the Products misbranded.

105.     As alleged herein, Defendant engaged in deceptive trade practices in the course of its business, in violation of Colo. Rev. Stat. § 6-1-105(1), by its material misrepresentations and omissions.

106.     Defendant intended to mislead Plaintiff Heintz and the Colorado Subclass and induce them to rely on their misrepresentations and omissions.

107.     Plaintiff Heintz and the Colorado Subclass acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

108.     Had Plaintiff Heintz and the Colorado Subclass been adequately informed and not intentionally deceived by Defendants, he would have acted differently by, without limitation, refraining from purchasing the Products, or paying less for them.

109.    Defendant's acts and omissions are likely to deceive the general public.

110.    Plaintiff Heintz and the Colorado Subclass seek all monetary and nonmonetary relief allowed by law, including, the greater of: (a) actual damages, or (b) $500, or (c) three times actual damages (for Defendant's bad faith conduct); and reasonable attorneys' fees and costs.

### PLAINTIFFS' FOURTH CAUSE OF ACTION
**Violation of Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.69)**
**Brought on behalf of Plaintiff Taylor and the Minnesota Subclass**

111.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

112.    Plaintiff Taylor brings this cause of action on behalf of herself and the members of the Minnesota Subclass.

113.    Plaintiff Taylor and the Minnesota Subclass members are individuals who purchased the Products for personal purposes.

114.    Defendant created and implemented a scheme to create a market for hard seltzers fortified with electrolytes and substantially increase the sales of its Products through a pattern of false and misleading statements and omissions. Defendant intended to deceive consumers into believing that the Products lawfully contained and provided electrolyte and hydration health benefits by misrepresenting or omitting material facts about the Products.

115.    Advertisements and representations induced consumers to believe the Products contained and provided electrolyte and hydration health benefits, when in fact consumers do not receive such benefits for the reasons explained herein. There is very little of the nutrients in the Products, and alcohol interferes with the metabolism and use of the nutrients. Moreover, alcohol dehydrates, rather than hydrates, consumers.

116.    Defendant engaged in acts, used and employed, fraud, false pretenses, false promises, misrepresentations, misleading statements and deceptive practices. Defendant's conduct had the capacity to, tendency to, and in fact did deceive reasonable consumers including Plaintiff Taylor. Reasonable consumers, including Plaintiff Taylor and the Minnesota Subclass members, would have found it material to their purchasing decisions that the Products contained little if any nutritional benefit from electrolytes, and that the Products would not provide hydration or other health benefits. Knowledge of these facts would have been a substantial factor in Plaintiff Taylor and Minnesota Subclass members' decisions to purchase the Products.

117.    Defendant owed Plaintiff Taylor and Minnesota Subclass members a duty to disclose these facts because they were known and/or accessible exclusively to Defendant who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendant actively concealed them; because Defendant intended for consumers to rely on the misrepresentations and omissions in question; and because Defendant made partial representations concerning the same subject matter as the omitted facts.

118.    Defendant knew or should have known that its representations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

119.    Defendant's conduct actually and proximately caused injury to Plaintiff Taylor and Minnesota Subclass members. Absent Defendant's unfair and fraudulent conduct, Plaintiff Taylor and Minnesota Subclass members would have behaved differently and would not have purchased the Products or would have paid less for them. Defendant's misrepresentations and omissions induced Plaintiff Taylor and Minnesota Subclass members to purchase the Products

that they would not have otherwise purchased and enter into purchase contracts they would not have otherwise entered into.

120. Plaintiff Taylor seeks—on behalf of herself and each member of the Minnesota Subclass—damages, attorney's fees, and costs, and injunctive relief; as well as any other relief the Court may deem just or proper. *See* M.S.A. § 8.31. This cause of action will benefit the public by requiring Defendant to permanently cease the deceptive sale and marketing of dangerous products to consumers in Minnesota and throughout the country.

### PLAINTIFFS' FIFTH CAUSE OF ACTION
**Violation of Minnesota False Statement in Advertising Law (Minn. Stat. § 325F.67)**
**On behalf of Plaintiff Taylor and the Minnesota Class**

121. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

122. Plaintiff Taylor brings this cause of action on behalf of herself and the members of the Minnesota Subclass.

123. Plaintiff Taylor and Minnesota Subclass members are individuals who purchased the Products for personal purposes.

124. Defendant created and implemented a scheme to create a market for hard seltzers fortified with electrolytes and substantially increase the sales of its Products through a pattern of false and misleading statements and omissions. Defendant intended to deceive consumers to believe that the Products lawfully contained and provided electrolyte and hydration health benefits by misrepresenting or omitting material facts about the Products.

125. Advertisements and representations induced consumers to believe the Products contained and provided electrolyte and hydration health benefits, when in fact consumers do not receive such benefits for the reasons explained herein. There is very little of the nutrients in the

Products, and alcohol interferes with the metabolism and use of the nutrients. Moreover, alcohol dehydrates, rather than hydrates, consumers.

126.    The labels on Defendant's Products misled consumers to believe the Products would provide electrolyte and hydration health benefits, and failed to disclose that alcohol interferes with the metabolism of nutrients and would dehydrate consumers.

127.    The representations and omissions were misleading and deceptive standing alone and were particularly deceptive in light of Defendant's advertising of its Products as hydration during physical activity.

128.    Defendant has made, published, disseminated, circulated and placed before the public, and caused to be made, published, disseminated, circulated and placed before the public advertisings of merchandise for use, consumption, purchase, and sale that contain material assertions, representations, and statements of fact that are untrue, deceptive, and misleading.

129.    Defendant's conduct had the capacity to, tendency to, and in fact did deceive reasonable consumers including Plaintiff Taylor and Minnesota Subclass members. Reasonable consumers, including Plaintiff Taylor, would have found it material to their purchasing decisions that Defendant's Products contained little if any nutritional benefit from electrolytes, and that the Products would not provide hydration or other health benefits. Knowledge of these facts would have been a substantial factor in Plaintiff Taylor's and Minnesota Subclass members' decisions to purchase the Products.

130.    Defendant owed Plaintiff Taylor and Minnesota Subclass members a duty to disclose these facts because they were known and/or accessible exclusively to Defendant who had exclusive and superior knowledge of the facts; because the facts would be material to

reasonable consumers; because Defendant actively concealed them; because Defendant intended for consumers to rely on the misrepresentations and omissions in question; and because Defendant made partial representations concerning the same subject matter as the omitted facts.

131.     Defendant knew or should have known that its representations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

132.     Defendant's conduct actually and proximately caused injury to Plaintiff Taylor and Minnesota Subclass members. Absent Defendant's unfair and fraudulent conduct, Plaintiff Taylor and Minnesota Subclass members would have behaved differently and would not have purchased the Products or would have paid less for them. Defendant's misrepresentations and omissions induced Plaintiff Taylor and Minnesota Subclass members to purchase the Products that they would not have otherwise purchased and enter into purchase contracts they would not have otherwise entered into.

133.     Plaintiff Taylor seeks—on behalf of herself and each member of the Minnesota Subclass—damages, attorney's fees, and costs, and injunctive relief; as well as any other relief the Court may deem just or proper. *See* M.S.A. § 8.31. This cause of action will benefit the public by requiring Defendant to permanently cease the deceptive sale and marketing of dangerous products to consumers in Minnesota and throughout the country.

**PLAINTIFFS' SIXTH CAUSE OF ACTION**
**Violation of Minnesota Deceptive Trade Practices (Minn. State. § 325D.43, *et seq.*)**
**On behalf of Plaintiff Taylor and the Minnesota Class**

134.     Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

135.     Plaintiff Taylor brings this cause of action on behalf of herself and the members

of the Minnesota Subclass.

136. Plaintiff Taylor and Minnesota Subclass members are individuals who purchased Products for personal purposes.

137. Defendant created and implemented a scheme to create a market for hard seltzers fortified with electrolytes and substantially increase the sales of its Products through a pattern of false and misleading statements and omissions. Defendant intended to deceive consumers to believe that the Products lawfully contained and provided electrolyte and hydration health benefits by misrepresenting or omitting material facts about the Products.

138. Advertisements and representations induced consumers to believe the Products contained and provided electrolyte and hydration health benefits, when in fact consumers do not receive such benefits for the reasons explained herein. There is very little of the nutrients in the Products, and alcohol interferes with the metabolism and use of the nutrients. Moreover, alcohol dehydrates, rather than hydrates, consumers.

139. The labels on Defendant's Products misled consumers to believe the Products would provide electrolyte and hydration health benefits, and failed to disclose that alcohol interferes with the metabolism of nutrients and would dehydrate consumers.

140. The representations and omissions were misleading and deceptive standing alone and were particularly deceptive in light of Defendant's advertising of its Products as hydration during physical activity.

141. Defendant has made, published, disseminated, circulated and placed before the public, and caused to be made, published, disseminated, circulated and placed before the public

advertisings of merchandise for use, consumption, purchase, and sale that contain material assertions, representations, and statements of fact that are untrue, deceptive, and misleading.

142.    Defendant's conduct had the capacity to, tendency to, and in fact did deceive reasonable consumers including Plaintiff Taylor. Reasonable consumers, including Plaintiff Taylor and Minnesota Subclass members, would have found it material to their purchasing decisions that the Products contained little if any nutritional benefit from electrolytes, and that the Products would not provide hydration or other health benefits. Knowledge of these facts would have been a substantial factor in Plaintiff Taylor's and Minnesota Subclass members' decisions to purchase Defendant's Products.

143.    Defendant owed Plaintiff Taylor and Minnesota Subclass members a duty to disclose these facts because they were known and/or accessible exclusively to Defendant who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendant actively concealed them; because Defendant intended for consumers to rely on the misrepresentations and omissions in question; and because Defendant made partial representations concerning the same subject matter as the omitted facts.

144.    Defendant knew or should have known that its representations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

145.    Defendant's conduct actually and proximately caused injury to Plaintiff Taylor and Minnesota Subclass members. Absent Defendant's unfair and fraudulent conduct, Plaintiff Taylor and Minnesota Subclass members would have behaved differently and would not have purchased the Products or would have paid less for them. Defendant's misrepresentations and

omissions induced Plaintiff Taylor and Minnesota Subclass members to purchase the Products that they would not have otherwise purchased and enter into purchase contracts they would not have otherwise entered into.

146.     Plaintiff Taylor seeks—on behalf of herself and each member of the Minnesota Subclass—injunctive relief, attorney's fees and costs, and equitable relief; as well as any other relief the Court may deem just or proper.

**PRAYER FOR RELIEF**

147.     WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgement against Defendant as follows:

A.     Certification of the proposed Classes, including appointment of Plaintiffs' counsel as class counsel;

B.     An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     An award of compensatory damages in an amount to be determined at trial, except as to those causes of action where compensatory damages are not available at law;

D.     An award of statutory damages in an amount to be determined at trial, except as to those causes of action where statutory damages are not available at law;

E.     An award of punitive damages in an amount to be determined at trial, except as to those causes of action where punitive damages are not available at law;

F.     An award of treble damages, except as to those causes of action where treble damages are not available at law;

G.      An award of restitution in an amount to be determined at trial, except as to those causes of action where restitution is not available at law;

H.      An award of nonrestitutionary disgorgement of profits in an amount to be determined at trial, except as to those causes of action where restitution is not available at law;

I.      An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

J.      For reasonable attorneys' fees and the costs of suit incurred; and

K.      For such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

148.    Plaintiffs hereby demand a trial by jury.

Dated: July 1 2022

**GUTRIDE SAFIER LLP**

*s/ Marie A. McCrary*
Marie A. McCrary (State Bar No. 52205)
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 45436)
  kali@gutridesafier.com
Seth A. Safier (*pro hac vice* forthcoming)
  seth@gutridesafier.com
Hayley Reynolds (*pro hac vice* forthcoming)
  hayley@gutridesafier.com
4450 Arapahoe Ave., Suite 100
Boulder, Colorado 80303
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*